# Ferdinand Luthy et al., Appellees, v. Henry Ream et al., Appellants.

## Gen. No. 5,972.

1. CORPORATIONS, § 173*—*validity of voting trust agreement.* A voting trust agreement entered into by a majority of the stockholders of a corporation whereby such stockholders assigned their stock to a trustee for a certain period of time, giving such trustee power to vote such stock as a unit as he may deem best, *held* · valid and not against public policy, where the purpose of the agreement was for keeping a certain faction of the stockholders from securing control of the corporation, which the members of the trust agreement believed would be detrimental to the interest of all the shareholders.

2. CORPORATIONS, § 173*—*when voting trust not shown to be illegal.* The formation of a voting trust by a majority of the stockholders is not shown to be illegal for the reason that its purpose was to enable three of their number to obtain salaries as officers of the corporation, where there is no proof that it had any such purpose except such inference as may be drawn from the bare fact that such stockholders after becoming elected officers voted

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

themselves salaries, it also appearing that the amount of the salaries thus voted was reasonable.

3. CORPORATIONS, § 285*—*right officer to participate in voting his salary.* A salary voted to an officer of a corporation is illegal if the resolution fixing the compensation is carried by his vote.

4. CORPORATIONS, § 285*—*who may fix salary of officers.* Courts have no authority to fix the salary of an officer of a corporation, since such salaries must be fixed by the directors of the corporation, under the statute.

5. CORPORATIONS, § 284*—*right of officers to salary.* A person who serves as an officer of a corporation when no salary has been provided must render his services gratuitously; salaries cannot be fixed for the time that has passed.

6. CORPORATIONS, § 173*—*when shareholder not entitled to question legality· of voting trust.* A voting trust agreement by a majority of the stockholders of a corporation cannot be attacked by the owner of a small minority of such shares on the ground that it is illegal because the trustee is left in sole control for a certain period of time, where a clause on the agreement contemplates that the trustee may die, resign or be removed for cause, and the vacancy so created filled and it is apparent from the agreement that only the holders of a majority of the shares in the voting trust could make objections to any act of the trustee.

Appeal from the Circuit Court of Peoria county; the Hon. JOHN M. NIEHAUS, Judge, presiding. Heard in this court at the October term, 1914. Affirmed in part and reversed in part. Opinion filed December 3, 1914.

JACK, IRWIN, JACK & MILES, for appellants.

THOMAS F. DOYLE, for Peru Plow & Wheel Co.

EVANS & EVANS and CHIPERFIELD & CHIPERFIELD, for appellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

The Peru Plow & Wheel Company, an Illinois corporation, has been engaged in the manufacture of plows and other farming implements at Peru in La Salle county for many years and has been generally

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

successful in business. Its corporate stock has been increased at least twice, and in 1912 consisted of 4,000 shares of the par value of $100 each. Under date of September 4, 1912, forty-one stockholders, owning in all 2,001 shares or a bare majority of the capital stock, entered into a trust agreement with Henry Ream, one of said stockholders. Said agreement recited that said stockholders deemed it to their interests that all of their stock should be voted as a unit upon all questions affecting the business and management of said company, and that Ream had consented to hold and vote such stock on behalf of the stockholders. It was therein agreed between said stockholders and said trustee for a valuable consideration, the receipt of which was acknowledged, and in consideration of the mutual covenants and agreements therein expressed, that said stockholders thereby assigned and transferred to said trustee the number of shares of stock of said company set opposite their respective names, to be held in trust by the said trustee for the respective stockholders by whom it was severally assigned, their personal representatives and assigns, upon the terms and conditions therein stated, some of which were as follows:

"1. The said Trustee shall hold, control and vote said stock as if he was the owner of all of said stock.

"2. Said Trustee shall determine how said stock shall be voted upon any question, at any time, and every meeting of the stockholders.

"3. All of said stock so held by the Trustee shall be voted as a unit.

"4. At all elections of directors of the Peru Plow & Wheel Company, said Trustee shall nominate three directors, to be voted for at such election, and said Trustee shall vote all said stock held by him as a unit for each and all of the directors so nominated by him."

The fifth clause provided the manner of filling a vacancy which might be caused by the death, resigna-

tion or removal of the trustee, which was to be done by a majority in amount of the persons who then held the stock now owned by the parties to the agreement. The agreement proceeded:

"6. Said Trustee shall prepare and issue to the stockholders certificates showing the amount of stock held on behalf of each stockholder respectively, and the stock so held may be divided and transferred in like manner as if it had not been assigned, in trust, subject to the rights and powers of the Trustee under this assignment. But no such assignment, or transfer of stock, shall be effective for any purpose until surrender of the certificate issued by said Trustee, and the issue of a new certificate to the purchaser or assignee thereof.

"7. No fee shall be charged by such Trustee herein designated for any services performed in connection with the trust hereby created.

"8. Said Trustee shall collect and receive all dividends on the stock transferred to and held by him and shall immediately pay over the same to the holders of trust certificates representing such stock as their respective interests appear. The Trustee shall not demand or receive any compensation for receiving and paying over such dividends.

"9. The rights, duties and powers hereby conferred upon said Trustee shall expire and wholly cease on the first day of September, A. D. 1922, and the Trustee shall, at said time, assign and transfer to the persons who then hold Trustee's certificates, evidencing their ownership of shares of stock, the amount of stock to which each holder thereof is shown by his Trustee's certificate to be entitled.

"10. Said Trustee hereby accepts the trust hereby created by the above and foregoing instrument, and hereby undertakes to hold, own and vote said stock as therein provided, and to re-transfer the same on the first day of September, A. D. 1922, to the holders of

Trustee's certificates, evidencing their right to receive the same.

"Said Trustee further undertakes at all times to vote the said stock by himself, or by proxy, and exercise his powers as Trustee in such manner as he shall deem to be for the best interests of the stockholders of the Peru Plow & Wheel Company. Said Trustee further undertakes to accept additional assignments of stock from any and all stockholders of the Peru Plow & Wheel Company, and to permit any stockholder thereof to become a subscriber to this agreement."

The contract contained some other provisions. It did not expressly provide that it could not be revoked before September 1, 1922, but that was the clear meaning of the language used. Each signer bound himself to all the others. Each agreement by one was a consideration for the signing by the others. The entire purpose intended to be accomplished would be likely to be defeated if a single signer, or his assignee of a trust certificate for two or more shares, could revoke the contract at will. The contract was signed by each of said forty-one stockholders, and by the trustee, and opposite each signature was set forth the number of shares owned by said stockholder. Each of said stockholders also assigned and delivered his certificate of stock to the trustee, and the trustee, pursuant to said agreement, issued to each stockholder a trust certificate, upon the following form:

"CERTIFICATE
of Trustee for Stockholders of the
PERU PLOW & WHEEL COMPANY
A corporation, under agreement of date September 4, 1912, with HENRY REAM, Trustee.

No. ......                                    ...... Shares
    THIS IS TO CERTIFY that ............ is the owner of..........shares of capital stock of the PERU PLOW & WHEEL COMPANY, held by the undersigned as Trustee, subject and pursuant to the

terms, conditions and stipulations of a certain agreement between the undersigned as Trustee and certain stockholders of the said PERU PLOW & WHEEL COMPANY joining in said agreement of date September 4, 1912, (a copy of which said agreement is on file with the undersigned Trustee....reference being had thereto as to all the terms, conditions and requirements of said trust).

"This certificate is transferable only on the books of the Trustee by the holder thereof in person or by attorney upon the surrender of this certificate properly endorsed, when like new certificates will be issued to the proper owner thereof of record.

IN WITNESS WHEREOF I, HENRY REAM, Trustee aforesaid, pursuant to said Agreement of September 4, 1912, have hereunto set my hand and seal, this ...... day of ..............., A. D. 1912.

                 HENRY REAM, (Seal)
                       Trustee.''

On the back of each certificate was a form for an assignment of such certificate. Section 1 of article 6 of the by-laws of the corporation then in force made the president and the vice-president and the manager an executive committee, and gave such committee, subject to the board of directors, supervision of all the business and affairs of the company and of the policy to be pursued in carrying on its business, and made the vice-president chairman of the executive committee, and made any two members of said committee a quorum to do business at any meeting thereof, however called. Section 4 of article 6 of said by-laws provided that the salaries of the officers and of the manager of the company should be fixed by the board of directors. On September 10, 1912, the annual meeting of said corporation was held, and all but six shares were represented, either in person or by proxy. At that time the trust agreement had not been signed by all of those whose names were signed thereto when it was offered in evidence, but Ream held a proxy from all those who subsequently signed it. The board con-

sisted of five members, and those who were then serving upon said board were all unanimously re-elected. They were Henry Ream, B. D. Brewster, William Holly, Ferdinand Luthy and D. W. Voorhees. The annual meeting of the directors was duly called and held on October 22, 1912. Ream was elected president, Brewster vice-president, Holly treasurer and Voorhees secretary, each unanimously. Voorhees was already the manager of the company at a salary of $6,000 per year, under a previous contract hereinafter referred to. It was moved that the salary of the president, vice-president and treasurer be each fixed at $2,400 per year, payable monthly, at the rate of $200 per month, and commencing November 1, 1912. Brewster, Holly and Ream voted for said motion. Luthy and Voorhees voted against it, and it was declared carried. Among the stockholders who had entered into said trust agreement were Kate Cahill, John D. Cahill and Cornelius J. Cahill, each owning twenty-three and one-third shares. At some time between that and February 25, 1913, they assigned their seventy shares to Thomas Cahill. Before he paid for said stock he went to the office of Henry Ream, trustee, and Ream read to him said trust agreement, and he also read it himself. He asked for a certificate of shares of the corporation and this was refused to him, and he was given and accepted a trust certificate in the form above set out for seventy shares. On February 25, 1913, Luthy owned 1,092 shares of the capital stock of the Peru Plow & Wheel Company, Voorhees owned 765 shares, George T. Page owned 100 shares and Thomas Cahill owned said trust certificate for 70 shares.

On that day Luthy, Voorhees, Page and Thomas Cahill filed their bill in equity against said trustee and all the other holders of trust certificates and the Peru Plow & Wheel Company, in which they charged that said trust agreement was void for various reasons,

stated in said bill, and that Thomas Cahill was entitled to have 70 shares of said capital stock issued to him by the officers of the company, and that the same had been refused to him; and the bill set up the election of said officers, and the fixing of said salaries by the affirmative vote of Ream, Brewster and Holly. The bill prayed that the trust agreement be cancelled; that the action of the directors in fixing said salaries be declared illegal; that Ream, Holly and Brewster be required to account to the company for the salaries received by each of them under said action and be required to pay the same to the company; that Ream, Brewster and Holly be declared to have forfeited their office as president, vice-president and treasurer, respectively, and be ousted therefrom; and that the president be directed to join with the secretary in issuing to Thomas Cahill a certificate for 70 shares of said capital stock. The corporation filed an answer and Henry Ream and all the other individual defendants also filed an answer. The cause was tried before the chancellor. A decree was entered, finding the facts concerning said trust agreement and said trust certificates and the transfer of the trust certificate to Thomas Cahill for 70 shares, and finding that said trust agreement was void as against public policy in that it placed the voting power and control of the corporation in said trustee, wholly separate from the ownership of said shares of stock, except the stock owned by Henry Ream, trustee; that the trustee had used such voting power to vest in himself and two other directors control of said corporation for the benefit of a part, only, of said stockholders, and that his conduct in that behalf was an abuse of the trust, and subjects said trust agreement to revocation and cancellation at the instance of Thomas Cahill, as the owner of 70 shares included in said trust agreement; that said trust agreement vests in Ream as trustee only the voting power as agent of the owners of stock

who joined in said trust agreement, and that he holds only the proxy of said owners who joined him in said agreement and has only the power of voting without any interest whatever in the ownership of said stock, and that such agreement is subject to revocation at the instance of the owners of such stock who joined in such agreement; that Thomas Cahill had the right to revoke such power and had revoked it, and that the complainants were entitled to have Ream enjoined from further voting said 70 shares at any stockholders' meeting, and that Ream, as president, or his successor in office, should be required to join the secretary in issuing to Thomas Cahill a certificate of said corporation for said 70 shares of stock. The decree also found the action above stated in fixing said salaries for Ream, Brewster and Holly and that said officers had rendered only nominal services, and that their action in voting themselves said salary was unlawful and gave them no right thereto, and that each of them had drawn $3,000 as such salaries and ought to restore the same to the company, with five per cent. interest, amounting to $87.50 each. It was then decreed that a certificate for 70 shares of capital stock be issued to Thomas Cahill, and that Ream be enjoined from further voting said 70 shares at any stockholders' meeting; and that Ream, Brewster and Holly each pay to the corporation within ten days $3,087.50, and that execution issue therefor; and they were enjoined from receiving any further sum as salary under said action of October 22, 1912, and it was ordered that Ream, Brewster and Holly pay the costs of suit. From that decree Ream, Brewster and Holly, and certain other of the signers of said trust agreement, prosecute this appeal.

There are numerous authorities which hold that the right to vote is an incident to the ownership of stock; that each stockholder owes his fellow-stockholders the duty to so use his right to vote upon his stock as to

protect the general interests of the stockholders, sustain the general welfare of the corporation and conduct its business upon honest and prudent principles; that, though the stockholder may shirk this duty by absenting himself from meetings of the stockholders or by refusing to vote, yet the law will not allow him to strip himself of the power to perform his duty; that the right to vote upon the stock cannot be separated from its ownership; that it is unlawful and a violation of public policy to contract for a separation of this voting power from the ownership of the capital stock; that the owners of trust certificates in a voting trust are the equitable owners of the shares of stock which such certificates represent; that the incidental right to vote upon the stock necessarily attaches to said trust certificates, and that, where such owners elect to exercise that right to vote, the law will not permit the trustee to refuse it to them, even though the contract so provides; that where individual stockholders form a combination to control the majority of the stock and agree not to transfer their shares to the opposition or not to vote against the combination, such contracts are in restraint of trade and are against public policy and are void, and any stockholder may withdraw from such contract, though it is agreed that it shall be irrevocable; that such a voting trust agreement creates an inactive, as distinguished from an active, trust and is revocable at the will of the beneficial owners of the stock; that any agreement or device by which stockholders surrender their voting powers are invalid; that the power to vote can only be delegated by proxy with power of revocation, and this regardless of any pooling agreement. Among the cases supporting these positions are *Cone's Ex'rs v. Russell*, 48 N. J. Eq. 208; *White v. Thomas Inflatable Tire Co.*, 52 N. J. Eq. 178; *Bache v. Central Leather Co.*, 78 N. J. Eq. 484; *Bostwick v. Chapman*, 60 Conn. 553; *Commonwealth v. Roydhouse*, 233 Pa. St. 234; *Harvey v. Linville Improvement Co.*, 118 N. C. 693,

32 L. R. A. 265; *Bridgers v. First Nat. Bank*, 152 N. C. 293; *Clarke v. Central Railroad & Banking Co.*, [50 Fed. 338], 15 L. R. A. 683. Other cases are cited in the foregoing authorities. Many of these opinions use very forcible language in announcing and sustaining the foregoing positions. The earlier editions of several of the text-books upon the subject are to the same effect.

In the main, these principles have not been adopted in Illinois. In *Faulds v. Yates*, 57 Ill. 416, speaking of an agreement similar in principle in many respects to the one here in question, the Court said:

"There was no fraud in the agreement, which has been so bitterly assailed in the argument. There was nothing unlawful in it. There was nothing which necessarily affected the rights and interests of the minority. Three persons, owning a majority of the stock, had the unquestioned right to combine, and thus secure the board of directors and the management of the property. Corporations are governed by the republican principle, that the whole are bound by the acts of the majority, when the acts conform to the law of their creation."

The Court there further said:

"They knew they must make large expenditures of money. Incompetent and unfriendly directors and officers might involve them in much trouble, heavy expense and useless litigation. They had a double interest to protect, their interests as shareholders, and their interests as lessees. It is strange that a man can not, for honest purposes, unite with others in the protection and security of his property and rights without liability to the charge of fraud and iniquity. This agreement was made between persons who had invested a large amount of capital in an enterprise somewhat perilous. As shrewd, skilful and prudent men, they were desirous of increasing the investment, and making the stock more valuable. Their interests were identical with the interests of the minority shareholders. They could not destroy the property of the company, for the lands were of immense value if the

mineral resources failed. If they increased the value of their own stock, they also increased the value of all other stock. If they destroyed the stock of others, they also, by the same act, destroyed their own. It is absurd to suppose that a sane man will ruin himself for the mere pleasure of ruining others."

The Court also said:

"The agreement in this case was not for the injury of the minority stockholders. It could not have been so intended, and we can not perceive that it could so operate. The selection of proper officers, the prudent management of the coal mines, the careful sale and purchase of stock, as provided for in the agreement, together with the expenditure of money in the improvement of the property, must have resulted in benefits to all the stockholders, and not alone to the parties to the particular agreement. A careful reading of the contract shows no hidden advantage intended, no fraud, no dishonesty."

This decision was approved in *Higgins v. Lansingh,* 154 Ill. 301, on page 357, and in *Kantzler v. Bensinger,* 214 Ill. 589. The same general question was before the court in *Venner v. Chicago City Ry. Co.,* 258 Ill. 523. Speaking of the voting trust agreement there under discussion, the Court said (p. 538) :

"The effect of the transfer was to place the legal title of the majority of the stock of the Chicago City Railway Company in the trustees, together with the voting power, which was thus separated from the beneficial ownership existing in the holders of the participation certificates, but was to be exercised in accordance with the latters' wishes, as expressed by a committee chosen by them for this purpose. Such a trust is not necessarily illegal. Ordinarily, men may make any disposition of their property they see fit, and they may therefore create a trust in their personal property for any purpose they deem best, so long as the purpose is not prohibited by statute or some rule of public policy. There is no statute of this State which prohibits a trust of the stock of a corporation for the purpose of controlling its management. There

is no rule of public policy in this State which prohibits the combination of the owners of a majority of the stock of a corporation for the purpose of controlling the corporation. On the contrary, it has been expressly held that a contract by the owners of more than one-half of the shares of stock of a corporation to elect the directors of the corporation so as to secure the management of its property, to ballot among themselves for directors and officers if they could not agree, to cast their vote as a unit as the majority should decide so as to control the election, and not to buy or sell stock except for their joint benefit, is not dishonest, violative of the rights of others or in contravention of public policy."

The court there refers with approval to *Brightman v. Bates*, 175 Mass. 105, in which in an opinion by Holmes, C. J., now a member of the Supreme Court of the United States, the Court said (p. 110):

"It is suggested that this was an unlawful attempt by the contracting parties to deprive themselves in advance of their deliberative power and duty as stockholders, and to submit themselves to the dictation of five men who in the future might not be even members of the corporation.   *   *   *   There is no doubt that the subscribers might actually have done the things stipulated without giving any one a right to complain.  That is to say, they might have held their stock and voted by previous understanding according to the advice of the committee, as long as they chose. The question is what they might contract to do; for this is supposed to be a case where a contract to do lawful acts is unlawful.   *   *   *   Supposing that the committee had been trustees, what would the syndicate agreement have amounted to then?  Merely an agreement by each of the trustees to vote as they should jointly agree to vote, and an agreement by the subscribers not to demand back their shares for three years. The latter term certainly is not illegal, whether valid or not. A stockholder has a right to put his shares in trust, whatever his motive. If the trust is an active one he cannot terminate it at will,

and the attempt to cut himself off by contract, instead of by the imposition of duties, from ending it; certainly is not enough to poison the covenant with the plaintiff.   *   *   *   It might be held that the duty of voting incident to the legal title made such a trust an active one in all cases.  As to the arrangement for the trustees uniting to elect their candidates, the decisions of other States show that such arrangements have been upheld, and we do not think that it needs argument to prove that they are lawful.  If stockholders want to make their power felt, they must unite. There is no reason why a majority should not agree to keep together.''

In the *Venner* case, *supra,* the Court further used the following language (p. 540):

''The stockholders can control the affairs of a corporation only through the election of directors, and at every such election there is necessarily a combination of shares upon the persons elected.  Such combination may be made at the time of the meeting, but there is no reason why stockholders may not agree beforehand to vote for certain persons as directors, and often they must do so in order to elect the persons desired.  There is nothing in the law to prevent the owners of a majority of the stock from giving proxies to the same person.  Unless restricted by its terms or by some statutory provision a proxy confers on the grantee a discretion, unlimited either in character or duration, until revoked.  A majority of the stockholders may therefore, by uniting in the same proxy, confer upon an agent unlimited discretion to vote their stock, and there is no policy of the law to prevent their transferring the stock to a trustee with the like unrestricted power.  It is the purpose for which the trust was created which must determine its legality.  Besides those already cited, it has been decided in the following cases, among others, that the pooling of stock by the owners for the purpose of electing directors and officers and controlling the management and business of the corporation was not against public policy so long as no fraud was committed or wrong done to the other

stockholders. (Citing cases). On the other hand, an agreement is invalid whose object is not the benefit of all the stockholders equally but is some unfair advantage to the parties to it, only, as where one of the parties is to have a certain office at a certain salary, or the parties to the agreement are to receive the profits to be made out of certain contracts to be entered into by the management under their direction, or the stock of the corporation is to be voted or its affairs managed by the determination of persons other than its stockholders or by a minority of its own stockholders.''

It is held by the Supreme Court of Virginia in *Carnagie Trust Co. v. Security Life Ins. Co.* [111 Va. 1], 31 L. R. A. (N. S.) 1186, that the mutual promises of subscribers to a voting trust agreement to be bound by the terms thereof forms a sufficient consideration to uphold the agreement, and that such a trust is an active and not a passive trust, and that the placing of capital stock in possession of a trustee for twenty-five years to enable the trustees more effectively to manage the corporation is not against public policy and does not separate the ownership of the stock from the beneficial interest in such a manner as to render the transaction void. In that case the following is quoted from a leading writer on corporation law:

''A deposit of certificates of stock with trustees for a specified period of time, either with or without a transfer of the same to the trustees, is legal, and is not in violation of the usual statute against the alienation of personal property, and is not opposed to public policy as a restraint upon trade, and is not an implied fraud upon stockholders who were allowed to participate, and is not an illegal separation of the voting power from the ownership of the stock; provided always that no actual fraud is involved in the transaction. In other words, such a pooling of stock is not illegal in itself, but, like all contracts, may be illegal if actual fraud is involved.''

In *Smith v. San Francisco & N. P. Ry. Co.,* 115 Cal. 584, 35 L. R. A. 309, the Supreme Court of California

held, one judge dissenting, that the owners of the majority of the stock in a corporation may lawfully agree to be bound by the will of the majority of themselves in voting the stock; and that a stockholder entering into an agreement with others as a condition of their joining to purchase the majority of the stock of a corporation, that such stock shall be voted as a unit for five years as a majority of them shall determine, cannot be revoked by such stockholders; that an agreement to restrain the power of voting stock for five years so as to keep the control of the corporation from passing to other persons, made by a person who united in purchasing a block of stock, is not illegal as in restraint of trade; and that such a separation of the voting power of such stock from its ownership is not illegal or against public policy. These doctrines are supported by the later editions of the text writers. The case above stated from 115 Cal. is cited with approval by our Supreme Court in the *Venner* case, *supra*. We therefore conclude that in this State (unless it be as to one particular, hereinafter discussed) this voting trust agreement is not against public policy, but is valid on its face, and creates an active trust; that the mutual agreements to assign the stock to a trustee, who should act for the benefit of all, form an adequate consideration as between the stockholders who signed the same; that the subscribers and those who purchase these certificates from them are bound by the agreement and cannot revoke it before September 1, 1922; provided the object of the agreement, the purpose for which it was formed, was not illegal. The purpose which caused the formation of this trust agreement is therefore a material inquiry.

A careful reading of the evidence reveals the conditions which led to the creation of this voting trust. The company was organized many years ago. Its original incorporators and owners lived in Peru and

vicinity. Several of the present defendants inherited their capital stock from their fathers. The work of manufacture has always been carried on at Peru. It has been a successful business. Its sales have averaged from $300,000 to $500,000 per year. Its profits have sometimes been as high as $60,000 or $100,000 per year, and have averaged $40,000 for many years. It has paid large dividends. In recent years a very considerable part of the stock came to be owned by Peoria parties. It is evident that the ownership of the stock became divided between a Peoria faction and a Peru faction. These factions distrusted each other. Voorhees lived at Peoria. He became manager. The evidence is that though the Peoria party owned a minority of the stock, yet it largely succeeded in controlling the corporation. In February, 1912, the Peoria stockholders succeeded in inducing the company to enter into a written contract with Voorhees by which he should be general manager of the business affairs of the company for five years at a salary of $6,000 per year and his traveling expenses, and he at the same time exacted and procured from Ream, who was then the president, a written promise to support Voorhees as general manager. The charter made the general office of the company at Peru. Voorhees opened an office of the company at Peoria. Luthy & Company were jobbers at Peoria of the same kind of implements manufactured by the Peru Plow & Wheel Company at Peru. Luthy had become the largest stockholder in the Peru Company. He was also a part owner of the business of Luthy & Company. Voorhees was also a part owner of that business, and was general manager of Luthy & Company. Voorhees therefore occupied two inconsistent positions. As general manager of the Peru Company, it was his duty to sell its product at the highest fair prices he could obtain. As general manager of Luthy & Company, it was his duty to procure merchandise from

the Peru Company at as low prices as he could reasonably obtain. He established the office of the Peru Company at Peoria in the same building with Luthy & Company and employed a stenographer there. All this he did upon his own responsibility and without consulting the president or the executive committee of the Peru Company. Instead of spending his time at Peru he spent most of his time at Peoria, over sixty miles away. He visited the works at Peru one day each week, and sometimes two. He charged the company and caused it to pay him his traveling expenses between the two places. He made much use of the telegraph and telephone between Peoria and Peru and charged this to the company. He kept the books of the company at the office in Peoria. All this time he was also acting as general manager of Luthy & Company and conducting that business. In none of these things did he consult the president or the executive committee of the Peru Company. It is obvious that these things produced uneasiness in the stockholders who lived in Peru, including B. D. Brewster, who had removed to Peoria, but evidently continued his allegiance with the Peru faction. In June, 1912, the board of directors thought it necessary or advisable to adopt a resolution which, among other things, said that the company should not sell to Luthy & Company for a greater or less price than they sold to others. There was no danger under these circumstances that Voorhees would sell to Luthy & Company at a higher price than he sold to others, and the evident purpose of the resolution was to prevent his selling to Luthy & Company at a lower price than to others, and this indicates that distrust existed. In June, July and August, 1912, Luthy, who was the largest single stockholder of the Peru Company, made efforts to purchase a controlling interest in its stock. He first applied in person to some of the stockholders residing in Peru to sell to him, and, failing to buy any stock in

that way, he employed several persons who lived elsewhere to buy stock for him. The proof indicates that the stock was considered to be worth par. He authorized his agents to offer as high as three times the par value. In August, members of the Peru faction discovered that Luthy had purchased enough so that the Peoria faction lacked only forty-four shares of having a majority. Then began the organization by the stockholders of this voting trust in order that the Peru stockholders might retain control of the corporation and prevent that control being acquired by the faction at Peoria. We are satisfied from the evidence that this was the purpose which induced the formation of this agreement. Those who entered into it believed that there was danger that the profits of the factory at Peru would be absorbed by the jobbing house of Luthy & Company and they believed that it was being managed from Peoria much more expensively than it had been and could be managed at Peru. It is obvious that what they intended was for the benefit of all the stockholders alike and, if we are correct in this, then the purpose was legal and valid. We would not be understood to mean that no reason appears in the evidence why the Peoria party desired to get control of the corporation. It is evident that they regarded the methods of the Peru party as slow and behind the times, and considered that control by Voorhees was much more advantageous to the stockholders. While the Peru party was in power the officers established a branch house at Council Bluffs and that venture was unprofitable. The proofs tend to show that the company lost $75,000 because of the opening of that branch house. Officers from the Peru party went to Council Bluffs and bought out a person having an interest in that business there, and paid him $7,500 therefor, and it was the opinion of the Peoria party that that purchase could have been made for $2,500. It is not doubted by the court but that each of these factions honestly believed that the welfare of the com-

pany and all its stockholders would be enhanced if that particular faction could have and maintain control over the business affairs of this company, and that each party was pursuing an honest and entirely lawful course in seeking to procure a majority of the shares of stock. It is immaterial to this inquiry whose judgment was the best. Whichever one was right, the purpose was lawful.

It is assumed in argument that at the time when the directors met in annual meeting in October, 1912, there was no by-law or resolution fixing any salary of president, vice-president or treasurer. The board was composed of five directors. The concurrence of three was necessary to fix a salary. Ream, Brewster and Holly were the only ones who voted for the salaries, and the vote of each of the three was necessary for the fixing of each salary. A salary voted to an officer of a corporation is illegal if the resolution fixing the compensation is carried by his vote. *McNulta v. Corn Belt Bank,* 164 Ill. 427; *Adams v. Burke,* 201 Ill. 395; *Voorhees v. Mason,* 245 Ill. 256. Therefore these salaries were illegally voted to and illegally received by these three officers, and so much of the decree as requires that they be refunded to the company was proper. Appellees contend that the purpose of forming this voting trust was to obtain these salaries, that is, to obtain a benefit special to three of the signers of this agreement. There is no proof that it had any such purpose, except such inference as may be drawn from the bare fact that more than a month after the agreement was signed by most of those who entered into it, these three men, after having been unanimously elected officers, voted to themselves these salaries. The proof is positive that in the making of this trust agreement there was no mention of any choice for directors or officers and nothing was said about any salary to be paid them, and we are satisfied that was not the purpose of the agreement. It was not un-

natural that these officers should think that they should be paid salaries. Voorhees, the secretary and general manager, was receiving $6,000 per year. A salary of $2,400 per year for the president of a corporation doing so large a business as we have above stated would not be unreasonable, and a salary of that amount for a treasurer who would have the responsibility of handling from $300,000 to $500,000 per year would be very meager. The vice-president was by the by-laws chairman of the executive committee, and his duties and responsibilities would certainly justify a salary of that amount. Appellees introduced proof that these three officers in fact did very little, but this was because Voorhees took to himself practically all of the duties which would devolve on these three officers. He determined and performed all that should have been submitted to a president and to an executive committee. He hired a cashier, who handled substantially all of the moneys and thus absorbed the duties of the treasurer. If he had permitted these officers to perform the ordinary duties pertaining to their offices, the amount of the salaries voted them would not have been unreasonable. We approve the decree of the court below on that subject solely because the law did not permit them to vote salaries to themselves. Appellants contend that if we approve that portion of the decree, we should send the cause back to the Circuit Court with direction to hear proofs and ascertain and decree what would be a reasonable compensation to these officers for the services which they rendered. The courts have no such authority. Salaries must be fixed by the board of directors under the statute. He who serves as the officer of a corporation when no salary has been provided must render his official services gratuitously. Salaries cannot be fixed for the time that has passed. *Ellis v. Ward,* 137 Ill. 509, and authorities there cited; *Fritze v. Equitable Building & Loan Society,* 186 Ill. 183. It is contended

that at least one of these officers, after he had received his salary, used some part of it to pay obligations which he assumed when he bought some of this capital stock in order to secure a majority to be signed to this agreement, and that the court may well suspect that they intended that result when this voting agreement was entered into. On a consideration of the slight evidence on this subject, we think this position unwarranted. After one of these officers had received his salary, he could make use of it as he saw fit and could apply it in payment of any debt he owed, and there is nothing in the evidence to suggest that payment for some of this capital stock was intended to be made out of salaries which they might thereafter vote themselves.

In the *Venner* case, *supra,* there was a committee of the stockholders who entered into the voting trust, which committee was to direct the policy of the trustee. Some suggestions are made in that case that through that committee the trustee was under the direction of the majority of those who entered into the voting trust. This agreement does not in terms authorize the majority of those who signed this trust agreement to control or direct the trust, and it is argued that the trustee is left in sole control for ten years, and that this renders the contract illegal. This perhaps presents the most serious question in the case. We have considered it in three lights. The fifth clause of the agreement contemplates that the trustee may die, may resign or may be removed for some cause, and provides how the vacancy so created shall be filled. Apparently no one could remove him, except those who held trust certificates for the majority of the shares in the voting trust, and this therefore seems to imply that under this agreement the members of the voting trust are to have control. Again, if, as in the *Venner* case, the members of the voting trust could lawfully appoint a committee of three to control the trust, why

could they not select one stockholder instead of three, and permit him to control the situation for the ten years of the life of the agreement? If so, we see no reason why they could not confer that power on the same stockholder whom they selected as trustee; and the members of this voting trust unanimously conferred this power upon the same man whom they selected as trustee. But further, the members of this voting trust have not repudiated or objected to any act which this trustee has performed. Obviously, such objection to be effective must be by those holding a majority of the number of shares. Thomas Cahill, the owner of a certificate for only 70 shares, is in a small minority. All the others, by signing the answer in this case, approved the acts of the trustee. For aught that we can know, the trustee will always consult and conform to the wishes of the majority in this voting trust, and if he does so, this contract ought not to be set aside because it leaves a loophole by which perhaps he might act contrary to the wishes of the majority. When the majority complain that he has disregarded their instructions, or acted contrary to their wishes, it will be time enough to consider what result should follow therefrom.

So far as the decree holds the action of the board in fixing the salaries of said officers illegal and requires each officer to refund what he has so received, with interest, and enjoins further payment under the action of October 22, 1912, it is affirmed. In all other respects it is reversed.

*Affirmed in part and reversed in part.*