JOSEPH L. CAHALL, Receiver of Lewes Fisheries Company,

*vs.*

WILLIAM C. LOFLAND, AND OTHERS.

*Kent, May* 6, 1921.

Directors and officers of a corporation are trustees for the stockholders, and their acts are to be tested according to the well-established rules of equity; but a director may freely purchase corporate stock, and owes no relation of trust to an individual stockholder which prohibits him from using information, derived from his office, which affects its value.

A trustee cannot profit by his office, and must be loyal and frank to those he represents.

Directors are presumed to serve without compensation, and courts will scrutinize closely their claims for compensation, this being particularly true

where all of the corporate officers are directors and the directors vote themselves compensation as such..

Where directors of a new corporation secured a lease of land for its factory, supervised the constructon, etc., they were not entitled to vote themselves shares of stock as compensation, for such services were along the lines of the duties of the directorate, which are those of management and supervision; the details of the business being delegated to inferior agents.

In view of the fact that General Corporation Act, § 21, gives directors the right to open books for subscription to stock of the company, and may imply a duty, directors are not entitled to vote themselves shares of stock for services in procuring subscriptions.

Proof as to the amount of sales of stock by corporate directors who voted themselves shares of stock as compensation therefor must be clear and satisfactory to overcome the presumption that the services were not to be paid for.

As General Corporation Act, § 14, contemplates a valid exercise of judgment on the part of directors of a corporation, as to value of labor performed, for which stock was given, directors of a corporation cannot vote themselves stock for their services, being incompetent to value their own services, on the theory the Constitution allows shares to be issued for labor.

It is not the duty of directors to indorse notes of the corporation, but it does not follow that they can enforce payment for such service, in absence of some agreement or understanding with the company.

Where directors were all officers of a corporation, they were not entitled to vote themselves salary for their services as such, though they indorsed notes of the corporation without any agreement for compensation; it appearing that they suffered no loss on their indorsement, and that their services were not extraordinary.

While directors are presumed to serve without compensation, they may be allowed payment for services outside the scope of their duties.

Directors may be allowed payment for services outside the scope of their duties, and may enforce payment therefor either pursuant to an express or implied agreement, or in absence of agreement may recover on *quantum meruit.*

As a corporation can act only through its officers and directors, and can become liable for services only where it had knowledge of the facts on which the liability was founded, a corporation cannot become liable for services rendered by its directors, all the directors being officers, for there was no disinterested person having knowledge of the facts which could be imputed to the corporation.

The relationship of directors to the corporation and those who are the real owners of its rights, property, and assets, the stockholders, resembles, in some respects, that of agent to principal, of managing to dormant partner,

and of trustee to beneficiary, and no advantage can be derived by a director by reason of his position.

Special contracts to pay compensation to directors for extra services are always voidable if carried by the votes of interested directors.

Where all the directors of a corporation were officers and they voted themselves compensation as directors concealing the fact from the stockholders, *held* that they could not thereafter retain compensation on the theory that the corporation had received the benefit of their services.

As the Constitution declares no corporation shall issue stock except for money paid, labor done, or personal property or real estate, stock cannot be issued for a promissory note, even though it is in a broad sense property, for it is not money paid, and this is so notwithstanding the corporation may enforce payment of such a note.

As against the corporation, notes given for stock are not void, and may be enforced even though stock could not be issued for notes.

A corporation has no authority to accept subscriptions to its capital stock on special terms, where the terms are such as to constitute a fraud on other subscribers, and such stipulations are void, though the subscription may be enforced by the corporation.

Where directors subscribed to corporate stock, giving their notes in payment, and the notes which were held by the corporation were paid from dividends, *held,* that as the corporation was not authorized to issue stock for notes, and the directors secured an unfair advantage over other stockholders, the contract may be set aside as fraudulent, and the directors forced to account for the fruits of their illegal acts, particularly as they took advantage of their position of trust.

Stockholders cannot be deemed to have ratified the acts of directors in acquiring stock by means fraudulent to the other stockholders merely because the corporate books were present at a stockholders' meeting and a committee was appointed to audit them, it not appearing that such audit was made, for one cannot ratify what he does not know.

Corporate directors, asserting ratification of their acts, have the burden of proving that the alleged ratification was made by stockholders with full knowledge of all material facts.

Stockholders of a corporation are not charged with knowledge of facts appearing in the records and books of the corporation.

Where directors improperly voted themselves shares of stock as compensation, and also purchased other shares giving their notes therefor, the notes being paid by dividends, the directors should be required to account for all profits on the transaction, and cannot, on dissolution of the corporation, be allowed to pay the par value of the stock, and retain the fruits of their breach of trust.

Where directors of a corporation, as a result of joint action and co-operation obtained stock and compensation in breach of their trust, they must be deemed joint tort-feasors, and on dissolution of the corporation are jointly liable; each being liable for the amounts obtained by the other.

An agent cannot serve two masters without intelligent consent of both.

Any surreptitious dealing between one principal and the agent of another principal is a fraud on the latter cognizable in equity.

An agent who attempts to act for both parties to a transaction with diverging or conflicting interests is liable to his principal for any loss resulting therefrom, where the principal is not fully advised.

It is the duty of an agent to disclose to his principal his knowledge as to the subject-matter.

If an agent, in contracting with a third person on behalf of his principal, is guilty of a fraud upon the principal, or breach of trust to which the third party is a privy, the contract is voidable at the option of the principal.

One who participates with a trustee in a breach of trust may be held liable in a court of equity, and if he still holds the trust property, or its proceeds, may be held as a constructive trustee, or if he no longer holds the property or its proceeds, may be required to account.

Where one who had merely made an offer to purchase corporate property induced the president of the corporation to act as his agent in reselling at a large advance, and the president to procure acceptance of the offer concealed those material facts from the directors and stockholders alike, the purchaser is liable for the president's concealment, and is responsible to the corporation, and he cannot evade responsibility on the theory that he traded with the corporation at arm's length.

One who purchased property of a corporation and resold the same at a profit, being liable to its shareholders, the transaction being tainted with fraud, a corporation to which the property was transferred, organized by the purchaser and other participants in the fraud, cannot defeat recovery on the theory that it was a bona fide purchaser.

Where a resolution of stockholders accepting an offer for the purchase of corporate property reserved all products manufactured before consummation of the sale, and conveyance was to be made on payment of the full purchase price, the purchaser, who was put into possession on payment of only one-tenth of the purchase price, is not entitled to the value of the products manufactured prior to payment of the purchase price and conveyance.

The failure of defendant to deny an allegation in a bill of a fact peculiarly within his knowledge is not an admission of the truth thereof, but must be proven.

Where the facts are peculiarly within the knowledge of the defendants, and they offered no evidence to contradict a showing of the complainant, complainant's evidence will be accepted as proof.

BILL FOR ACCOUNTING. The bill seeks to recover from former officers and directors of a dissolved corporation, and others who had business transactions with said officers and directors, moneys and property alleged to be due said company. The cause was heard on bill, amended bill, answers, testimony of witnesses produced before and heard orally by the Chancellor and exhibits, and the facts are sufficiently stated in the opinion of the Chancellor. See, also, *ante p.* 125, 107 *Atl.* 769, and *ante p.* 162, 108 *Atl.* 752.

*Henry Ridgely* and *George M. Fisher, Jr.,* for complainant.

*John M. Richardson,* and *Richard S. Rodney,* for defendants, Lofland, Lank, Joseph, and Tunnell.

*David J. Reinhardt,* and *Daniel J. Layton,* for defendants Bookhammer, Baylis, and Thompson.

*George N. Davis,* for defendants Penington and Lewes Oil & Chemical Company.

THE CHANCELLOR. The bill is by the receiver of a corporation voluntarily dissolved to recover from those who were formerly its officers and directors moneys which they wrongly took from the company in transactions with it, and to recover from them and others property of the company which had been improperly disposed of by the officers and directors thereof.

Lewes Fisheries Company was incorporated in January, 1911, to catch fish and sell the oil and fertilizing scrap obtained therefrom. It began business January 31, 1911. Its business was conducted in Lewes, Delaware, and for this purpose it acquired steamboats, and erected a factory on the shore on land leased from the town of Lewes. The business was profitable from the start, dividends were declared each year, and on July 30, 1917, the company had in hand nearly three hundred thousand dollars in cash and about one hundred thousand dollars more of assets readily convertible into cash, and also its steamers and factory. Notwithstanding this success the directors authorized the sale of the steamers of the company and also sought purchasers for the whole plant consisting of steamers and factory. Later the stockholders accepted an offer for the plant and the company was dissolved by the stockholders and the assets converted and all but a small part thereof has been distributed by the directors to the stockholders.

A stockholder filed a bill in 1918 alleging irregularities by the directors, and on February 17, 1919, a receiver was appointed to take legal steps to uncover the wrong and right it. On July 28, 1919, a bill was filed by the receiver against seven of the directors of the company, against the purchaser of the plant and equipment of the company and against the new corporation to which the property so purchased had been transferred by such purchaser. It charges that the directors wrongly paid themselves moneys of the company for salaries or services as directors. It also seeks to avoid transactions by which the directors wrongfully voted to themselves shares of stock for services, and took other shares for which no consideration was paid, and to recover moneys of the company received as dividends on these shares and as distributions thereon in liquidation. It also seeks to annul the sale of steamers, plant and equipment of the company, and a restoration thereof to the company by the present holder thereof. Another claim made by the receiver is that if the sale is not set aside still the company did not receive from the purchaser all that it was entitled to have, and it seeks payment thereof. Such is an outline of the bill.

Six of the defendants, viz.: William C. Lofland, James T. Lank, Harland M. Joseph, William H. Bookhammer, John R. Baylis and William J. Thompson, were directors from the organization of the company to the dissolution thereof. David W. Burbage, one other of the original directors, retired as such in August, 1912. William E. Tunnel, another defendant, was elected a director in 1916 and served to the end. From 1912 to 1916 there were but six directors. Lofland was president of the company and Lank its secretary during the existence of the corporation, and Baylis, Thompson and Lank were at various times treasurer of the company, and no other person than they acted as treasurer.

The several grievances will be considered in this order: (1) The charge that six of the individual defendants, Lofland, Lank, Joseph, Bookhammer, Baylis and Thompson, directors of the company, illegally voted to themselves each fifteen shares of stock of the company on September 18, 1911, as full paid stock. (2) The charge that the same six directors illegally voted to themselves money for services rendered as directors, and that each

received one thousand dollars per annum for six years. (3) The charge that on February 14, 1912, seventy shares of stock of the company were issued by the directors as officers of the company to each of the same six directors, each of whom gave his promissory notes for the par value of the stock, but paid no money or other thing of value therefor, the dividends declared on these shares being credited on the indebtedness represented by the notes, and some of the moneys voted as payments for services as mentioned above being also so credited. (4) The charge that the sale of the steamers and factory of the company had been effected by fraud. (5) The charge that the company had not received from the purchaser the whole of the purchase price, or rather all of the money to which the company was entitled.

Throughout the consideration of this case it must be borne in mind that the directors and officers of a corportion are stewards or trustees for the stockholders, and their acts are to be tested as such according to the searching, drastic and farreaching rules of conduct which experience has found to be salutary to protect trust beneficiaries. A trustee cannot profit by his office and must be loyal and frank to those he represents. The following words of the Court in *Du Pont v. Du Pont*, (*D. C.*) 242 *Fed.* 98, at page 136, fit issues raised in this present case, viz.:

"The duties of a director or other officer of a corporation in transactions where he is representing his company are governed by well-established and familar rules of equity. A director of a corporation may freely purchase its stock, and occupies no relation of trust to an individual stockholder which prohibits his using whatever advantage his position may afford him through knowledge of its business and condition superior to that of the stockholder with whom he deals. He is not accountable to the stockholder for withholding information from him which affects the value of the stock, but to the corporation, the whole body of stockholders, he stands in a fiduciary relation which requires him to exercise the utmost good faith in managing the business affairs of the company with a view to promote, not his own interests, but the common interests, and he cannot directly or indirectly derive any personal benefit or advantage by reason of his position distinct from the coshareholders. By assuming the office, he undertakes to give his best judgment in the interest of the corporation in all matters in which he is acting for it untrameled by hostile interests in himself or others. If he acts for himself in matters where his interest conflicts with his duty, the law holds the transaction constructively fraudulent and voidable at the election of the corporation. He is disqualified by the intervention of a personal interest to act in the performance of his

duties as trustee for the company, and is not permitted to obtain title to the property where he has any duty to perform which is inconsistent with the character of a purchaser on his own account. When a director attempts in violation of his duty to acquire interests adverse to the corporation in respect to any matter involved in the confidence which has been reposed in him, as to which equity imposes a disability upon him to deal in his own behalf, the court will hold him as a trustee for the corporation, and he must account for the profits which otherwise would have accrued to the corporation. The product of the transaction will belong to the corporation exclusively. The law will presume that whatever was done in furtherance of the original scheme, under which the agency was created, was done under and through the agency. The burden of showing that the relation was changed before or during the agency rests upon the party so affirming."

1.  The taking of fifteen shares of stock by each director.

On September 18, 1911, fifteen shares of stock of the company were issued to each of six directors, Lofland, Lank, Joseph, Baylis, Bookhammer, and Thompson, and on September 21, 1911, a resolution was adopted by the board that—

"The directors be voted fifteen (15) shares of stock each for services in organizing the company and commissions for selling the stock."

No money was received by the company from the directors for the stock, but still the shares were issued to them as full paid and non-assessable, and are still held by them. Dividends were paid thereon as declared currently, and also in liquidation after dissolution, and the total paid by the company on the ninety shares was $20,250.00.

The issue and receipt of the stock is admitted by the defendants, and in their answers justified as taken for services in organizing the company and "selling a large part" of its capital stock. Three of these defendants, Lofland, Bookhammer and Thompson were incorporators. The other incorporator was Burbage. Obviously, then, the shares were not donated to the directors as incorporators, for three of the directors who voted to themselves stock were not incorporators.

Two classes of service are set out in the resolution, viz.: (1). Organizing the company, and (2) selling stock of the company. All these services were rendered in 1911. Strictly speaking, the organization of a corporation is limited to the formal acts taken by the incorporators to start the legal entity so that it can trans-

act business, the acts being the adoption of by-laws, election of officers, providing for the issue of stock, etc. These duties were presumably assumed without expectation of compensation, and hence the directors could not legally vote themselves compensation for such services.

At the hearing the three directors who testified, namely, Bookhammer, Lank and Baylis, undertook to enlarge the meaning of the word "organization" so as to include services for securing a lease of land for the factory; making plans and specifications for the factory and supervising its construction (the value of this service being stated by them to be ten thousand dollars, and a saving of architect's commissions to that amount); the making of visits to Milford to urge speed in completing the construction of vessels being built for the company; and some other matters clearly unconnected with the organization of the company, even if a wide meaning be given to the word.

Directors are presumed to serve without compensation, and courts will scrutinize closely their claims for compensation. Their allegations in legal proceedings respecting their services should be strictly construed. Particularly is is true where all the officers are directors and the directors vote themselves compensation. As the services were not in connection with the organization of the company as usually defined, they cannot be accepted as the consideration for the stock. It is very doubtful, too, whether they were such extraordianry services as would imply an obligation of payment. All the services were rendered immediately following the incorporation when the securing of capital, a plant and employees would be the natural and necessary duties of those who were its managers. At this period the management of the affairs of the company which by law is committed to the directors naturally means the taking of these initial and essential steps, and being things where judgment and discretion are involved they could not have been delegated to paid employees. The adjudicated cases do not throw much light on the situation here. The duties of directors are administrative, and relate to supervision, direction and control, the details of the business being delegated to inferior officers, agents and employees. This is what is meant by management.

At the outset of corporate life management must be constructive and the services mentioned as extraordinary were not such, but were ordinary, i. e., suitable and adapted to the then existing needs of the infant corporation. The first directors of a newly organized corporation cannot, therefore, legally vote to themselves, without authority from some other source, compensation for obtaining capital and a plant for the company and starting it off.

In justice to the directors it should be pointed out that the operations of the new company were very successfully started and developed into a profitable business. Capital was obtained, in part by sales of stock by the directors and in part by a broker in Philadelphia employed for the purpose; a lease of land at one dollar per year was secured; the factory was erected; they bought and had built for them three vessels; and within about ten months after the incorporation of the company had made net earnings of twenty-five per cent. on the capital invested, and on November 16, 1911, declared a cash dividend of twenty per cent. on the stock. All of the directors in varying degrees and at various times gave personal attention to the details of the business. But for the reasons above given their diligence and wisdom in the care of the business and the success attained thus early do not entitle them to vote themselves shares of stock as compensation for these services. In this connection there are other considerations to be pointed out later herein.

For the reasons above given the directors had no right to vote themselves shares of stock as commissions on stock sold by them, even assuming as proven the claim made by some of them in their testimony, that the six directors together sold $60,000.00 or $70,000.00 worth of stock of the company. It is urged for them that the commissions at the same rate as were paid for subscriptions obtained by the Philadelphia broker would have been $10,500.00 if sold by the broker. It is probably a duty of the initial directors to secure subscriptions to stock. By the General Incorporation Act (22 *Del. Laws, c.* 394) § 21, the right to open books for subscriptions to stock of the company is given to the directors. This power may as to the newly born legal entity imply a duty. But it is not clear by the authorities that a director

can enforce payment for selling shares of the company without an antecedent employment with a clear understanding by both him and the corporation that he would be compensated. In *N. Y. & N. H. R. Co. v. Ketchum,* 27 *Conn.* 170, a remedy was denied a director, for he was bound in good faith to endeavor to induce other people to take the stock. On the other hand, in *Cheeney v. Lafayette, etc., Co.,* 68 *Ill.* 570, 18 *Am. Rep.* 584, and *Waters v. American, etc., Co.,* 102 *Md.* 212, 62 *Atl.* 357, a director was allowed to recover, in the first case on a *quantum meruit,* and in the latter case there were some special features not here present.

The evidence as to the number of shares sold by the directors severally was unsatisfactory, and three of them gave no testimony in the case on this or any other matter involved. When, to whom and how many shares were sold were indefinitely stated by those directors who testified. Nor did it appear convincingly that sales of the number of shares above mentioned were made by the directors. Proof of such matters under the circumstances of this case should be clear and satisfactory to overcome the presumption that the services were not to be paid for, and such proof was not furnished.

These directors were not justified in taking shares of stock or money for services on the ground that by the Constitution shares may be issued for labor done; for as will be shown, there has been no valid exercise of judgment on the part of the directors of the company as to the value of such labor, as contemplated by section 14 of the General Incorporation Act, the six directors being incompetent to value their own services.

It is found, therefore, that the six directors were not entitled to take without paying therefor fifteen shares of stock of the company which each received on September 18, 1911, for services in organizing the company, or for commissions for selling to others shares of stock of the company, and as it appears that payment therefor has not been made, proper reparation must be made to the corporation, and this will be considered later.

2. Payments to the directors for services or salaries.

It is charged that the same six directors wrongfully voted to themselves and took salaries as directors. Neither by the

charter nor by the by-laws was payment to the directors of salaries authorized. It was shown, and in fact admitted, that the same six defendants each received from the company for each of the years 1912, 1913, 1914, 1915, 1916, 1917 one thousand dollars, or a total for each one of six thousand dollars. At a meeting of the directors on August 4, 1912, five of said six defendants being present, it was voted "that the directors of the company be made an allowance of $1,000 for services." On January 7, 1914, it was ordered "that the directors be paid $1,000 for services for the year 1913." In 1914 and 1915, no official action was taken. At a directors' meeting on December 17, 1917, these same six defendants and another director, Tunnell, being present, voted:

"That the directors be allowed $1,000 each per year for services for year nineteen hundred and sixteen and seventeen, and checks were ordered drawn at once."

These last mentioned checks each for two thousand dollars, including one for Tunnell, were either cashed by the payees or with other sums voted for services were credited to the several directors as payments on account of seventy shares of stock of the company which they had each received from the company and for the full par value of which they had given their individual notes.

The moneys so paid in 1912 do not appear anywhere on the account books of the company as payments for directors' services or salaries, but the payment thereof was concealed by including them as part of the moneys paid as operating expenses. In later years they appear on the accounts as lump sums of six thousand dollars as "directors' salaries," though voted as for services. In the financial reports made to the stockholders it does not appear that the directors received salaries or compensation as an individual item. Lofland as general manager during all the time received a salary of one thousand dollars the first year, and eighteen hundred dollars thereafter, and it was his duty to give his entire time to his work, and Thompson, Lank and Baylis each received a salary of five hundred dollars in the years in which they served as treasurer.

It is admitted by these defendants that these moneys were so obtained, and by their answers to the bill of the receiver they

claim that as directors they rendered services "outside of and foreign to the usual duties of said directors," without specifying the character thereof, and that the services were reasonably worth more than the sums taken. These six defendants were also defendants in the bill filed by Jones, the stockholder, which resulted in the appointment of the receiver, and in their sworn answer filed in that suit, these same defendant directors specified as special services rendered to the company outside their duties, that they had personally endorsed notes which the company had taken for subscriptions to its capital stock and for manufactured product, the endorsement being made to enable the company to have the notes discounted.

Lofland, the president and general manager of the company, informed at various times three several stockholders that the directors were not to get, or were not getting, paid, and several other stockholders testified that they were ignorant of the fact of the payment to the directors of salaries or for services.

At the hearing only three of the seven defendant directors, Baylis, Bookhammer and Lank, testified and they testified as to the services rendered after 1911, which it was claimed for them were outside their duties as directors. One such item was the endorsement by the directors of notes of the company, and Lank was the only one who testified on this subject. His testimony was not definite as to details, the only note specified being one for ten thousand dollars given in 1911; but in that year the directors each took fifteen shares of stock and according to those directors who testified these shares were taken for all services during the year 1911, including, therefore, the service of endorsing notes. Lank could not state details as to other notes, and only estimated that at one time the aggregate of the notes endorsed was probably seventy thousand dollars. None of the directors suffered any loss by reason of their endorsements. It was clearly not a duty of the directors to so endorse notes of the company, but it does not follow that they can enforce payment for such service in the absence of some agreement or understanding with the company. No authority is cited or found supporting such an action.

There was testimony as to other services. Some of the directors went out occasionally on the fishing boats, although there

was a paid superintendent of the fishing fleet; once or twice one or two of them shovelled fish at the factory to help save a large catch. On one occasion two of them helped load some fish oil. Some of them hunted up extra labor to handle large catches of fish. A stranded vessel was pulled off the shore by one of the steamers of the company, several directors and the president and general manager being present, and salvage money was obtained for the company. One of the directors went to Charleston, S. C., and successfully straightened out a contest respecting a cargo of fish scrap delivered there by the company.

None of the directors did all of these things. Some did little and others more. The acts were very occasional, and in some cases single acts. There was a person or persons employed by the company whose duty it was to perform each of these services. The defendants were unable to state what services were rendered in each particular year. Though some were paid salaries as officials, all received the same annual allowance for services as directors. They even took pay for services for the calendar year 1917, though the business was sold on August 10 of that year, and took pay even in years when there was no resolution passed by them. In effect these payments were salaries, and a fuller explanation of the character of their services and the circumstances under which they were rendered would demonstrate this.

It is settled that directors are not entitled to enforce payment of salaries, and are presumed to serve without pay. Directors may be rightly allowed payment for services to the company which were clearly and unmistakably outside the scope of their duties, and may enforce payment for such services either pursuant to an express or implied agreement that they are to be paid, or in the absence of agreement may recover under a *quantum meruit.*

But in all such cases there must be the knowledge of the corporation of the services in order to create a legal liability to pay therefor, and as the corporation can see and hear only through its officers and agents, such knowledge must be had by some officer or agent competent to act for the corporation in such matters. Legal liability to pay for services cannot be fastened on a person unless he knew, or should have known, of facts on which the liability rests. The extraordinary and unprecedented features of

this case, so far as disclosed in any decision known to this Court, are that all of the officers of the company were directors and all of the directors took compensation voted by themselves to themselves for services rendered to the company by them; that no authority for, or approval of, such action was given by the stockholders; and that no report was made by the officers or directors to the stockholders of the taking of such compensation, or that compensation was desired. The only persons whose knowledge of the facts as to the services would bind the corporation were the officers and directors. Knowledge by some stockholders, and by the employees of the facts would not affect the corporation, for the former might rightly have assumed that all services were without pay, and it was outside the duties and responsibilities of the latter. As the directors voted to themselves compensation, there was no one to see and hear for the corporation. Hence there was no basis of legal liability based on knowledge, or means of knowledge.

Furthermore, the relationship of directors to the corporation and to those who are the real owners of its rights, property and assets, the stockholders, resembles in some respects that of agent to principal, of managing to dormant partner, and of trustee to beneficiary. 2 *Machem on Corporations*, § 1399. One fundamental feature of the relationship is fidelity as to a trust, and that no advantage can be derived by a director by reason of his position.

"If he acts for himself in matters where his interest conflicts with his duty, the law holds the transaction constructively fraudulent and voidable at the election of the corporation." *Du Pont v. Du Pont*, (*D. C.*) 242 *Fed.* 136.

Special contracts to pay compensation to directors for extra services are everywhere and always voidable if carried by votes of interested directors. *Gardner v. Butler*, 30 *N. J. Eq.* 702; *Raynolds v. Diamond, etc., Co.*, 69 *N. J. Eq.* 299, 60 *Atl.* 941; *Camden Land Co. v. Lewis*, 101 *Me.* 78, 97, 63 *Atl.* 523; *Luthy v. Ream*, 190 *Ill. App.* 315. Therefore, even if the services rendered by the directors were extraordinary and outside their duties as directors, still they could not have recovered pay therefor in an action and should not in this proceeding be allowed to retain what they have received as such pay, or to have credited on the notes of any of the sums so voted for services. This may seem

to be a hard rule, but the directors are responsible for the situation. Their plain duty was to have obtained the approval of the stockholders, at least before voting themselves pay in one form or another, and have only themselves to blame if reparation is enforced at this late date, for they have not at any time frankly, clearly and fully disclosed to the stockholders their own dealings with the corporate property, and have in fact concealed some of them by misleading entries in the account books of the corporation.

It may be urged, however, that even if the voting and taking of compensation was constructively fraudulent, still as the company received the benefit of the services compensation therefor should be allowed by this court. This was done by the court in *Gardner v. Butler*, 30 *N. J. Eq.* 702, where two of several directors made an agreement to render certain services to the company upon a commission, and afterwards a bill was filed by the assignee in bankruptcy of a stockholder to set aside the agreement and recover the commission so paid. "The contract will not be regarded," said the court, "but the services having been rendered and the company having received the benefit of them, it would be manifestly inequitable to deny the trustee a fair equivalent therefor." In the cited case there was the independent judgment of those of the directors who were not parties to the agreement with the company and in that respect it differed from the case under consideration. Where all of the officers of a corporation are members of the board of directors and the directors vote to each director compensation for services rendered to the corporation the action is invalid, whether the services be ordinary or extraordinary, or within or without the usual duties of the directors, unless there be some statute, charter or by-law authorizing such action, or it be authorized or confirmed by the stockholders; and consequently a director could not recover such compensation in an action at law, neither on an express or implied contract, or on a *quantum meruit* on an implied contract; and furthermore, he can be compelled to return to the corporation any such compensation received by him.

The conclusion is that the salutary rule above stated is applicable here, and denies to the six directors the right to take the

fifteen shares of stock voted to each of them in 1911, or to take
and retain the benefit of the sums voted annually for services.

It is found, therefore, that the six directors are not entitled
to have credited on the notes which they gave to the company
for shares of stock as hereinafter considered any of the sums so
voted to themselves for services, or entitled to any money actually
paid out to them as having been so voted for services, and they
and William E. Tunnell will be required to refund to the receiver
any moneys so actually paid out by the company to them for
these services.

3.  The charge that notes were given by the directors for
stock taken by them will next be considered.

On February 14, 1912, seventy shares of stock were issued
to each of the same six defendants, Lofland, Lank, Joseph, Baylis,
Bookhammer and Thompson, as full paid and non-assessable.
Each of them gave as the sole consideration for his shares two
promissory notes in which he was the maker and the company
payee, viz.: One for five thousand dollars payable in two years,
and the other for two thousand dollars payable on demand.  On
January 15, 1914, a dividend of ten per cent. amounting to seven
hundred dollars was credited on each note on the account books
of the company, and the notes were also credited with the amounts
received by the six directors for salaries or services.  In the report
of the company submitted to the stockholders on November 29,
1913, these notes do not appear as bills receivable, as they should
have, and in fact there is in the statement of assets no item of
bills receivable, but a statement of "Due from individuals and
firms."  There was no action of the board authorizing the trans-
action, and no report of it was ever made so far as the evidence
shows.  Dividends were paid out on these shares as declared, and
one hundred and sixty-five per cent. paid in the liquidation pro-
ceeding.

In their answers each of these six defendants admit receiving
the shares, but say the notes were given and received as payment;
that each maker was financially responsible for the amount of
his note; and that they were out of their possession and held by
the company as part of its assets.  None of these notes were used
by the company, and there was some testimony that banks had

refused to discount them for the company. The notes were not delivered to the receiver, and it was not claimed that they had been paid by the makers.

A calculation was made by the solicitor for the complainant showing that even allowing as valid credits the dividends and salaries credited on the notes on the books of the company, there was still due on December 18, 1917, on each of said notes $2,082.87; and further, that as to the whole four hundred and twenty shares voted by the six directors to themselves, they together carried off eighty-six thousand dollars in money, and in addition were together credited with over twelve thousand dollars on the notes, the credits being dividends and salaries.

The contention of the complainant is that the issue of the shares was a fraud on the other stockholders because they were taken secretly and in violation of the Constitution and statutes of the State, and that the holders thereof acquired no rights as stockholders. The bill demands that they be required to refund to the receiver moneys so received by them. For the directors it was urged that promissory notes being personal property could be taken as payment.

The constitution declares:

"No corporation shall issue stock except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation."

A promissory note in a broad sense is property; but it is only a promise to pay money and, therefore, is a mere evidence of indebtedness. A promise to pay money is not "money paid," and cannot be so taken, and it would be a travesty to say that it is "property actually acquired" and, therefore, may be taken in payment for shares where there is a prohibition such as there is in Delaware. No authority so holds. In a case directly in point it was held otherwise. In *McCarthy v. Texas, etc., Co.,* (*Tex. Civ. App.*) 142 *S. W.* 96, McCarthy had made a contract with an authorized agent of a corporation to take shares to be paid partly in cash and partly by promissory notes endorsed by a solvent endorser and secured by the stock as collateral. By the Constitution of Texas "no corporation shall issue stock or bond except for money paid, labor done or property actually received." Upon

a refusal of the company to deliver the stock an action was brought to compel the issue of the stock, or for damages for breach of the contract. It was held that the contract was unenforceable, being *ultra vires* and void. The Court said:

"The fact that the notes to be given by McCarthy were to be endorsed by a solvent endorser and secured by a pledge of the stock does not in any wise affect the question. If it is permissible to accept notes at all, unsecured, as well as secured, notes could be accepted. Neither is the question affected by the fact that part of the subscription is to be paid in cash; for if a part cash payment meets the requirements of the Constitution, then there is no limit to the minimum cash payment that could be accepted, and to hold that a part cash payment would be sufficient in effect would nulify the constitutional provision. * * *

"It is further contended that such notes are 'property actually received,' within the meaning of the Constitution. It is true a promissory note is 'property' in one sense of the word, as, for instance, when it is in the hands of a third person. It has frequently been so held; but, as between the original parties to the same, it is but a mere evidence of indebtedness, and it would be a strained and unnatural interpretation of the Constitution to hold that it was there used in the sense contended for by appellants. To so hold would be to say that in one breath the organic law expressly refused to accept it as 'money paid,' and in the next breath permitted it under the guise of property, thus convicting the framers of the Constitution of a palpable inconsistency."

A promissory note given for stock is not void as against the corporation, and it may enforce payment of the note. In *Washer v. Smyer*, 109 *Tex.* 398, 211 *S. W.* 985, 4 *A. L. R.* 1320, the Court so held, though it also found that the note could not under the Constitution have been taken by the company for stock. Other cases were cited by the defendants where this liability was enforced. *Jenkins v. Armour*, 6 *Biss.* (*U. S.*) 312, *Fed. Cas. No.* 7260; *German, etc., Co., v. Wanner*, 25 *N. D.* 479, 142 *N. W.* 463, 52 *L. R. A.* (*N. S.*) 453; *Meholin v. Carlson*, 17 *Idaho*, 742, 107 *Pac.* 755, 134 *Am. St. Rep.* 286. But none of these cases affirm the right of a corporation to take promissory notes for stock in the face of a constitutional provision such as that in Delaware. In the last case, that in Idaho, the statute was substantially different from that of the Constitution of Delaware.

The arrangement under which these shares were issued was a fraud on the other stockholders. A corporation has no authority to accept subscriptions to its capital stock upon special terms

where the terms are such as to constitute a fraud upon other subscribers, or upon persons who become creditors of the corporation. Such stipulations are void, but not the subscription which may be enforced by the corporation. *Clark & Marshall on Private Corporations, p.* 1452; *Meholin v. Carlson,* 17 *Idaho,* 742, 107 *Pac.* 755, 134 *Am. St. Rep.* 286.

Clearly these six directors, who were also all the officers of the corporation, took an unfair advantage of their position and opportunities to obtain shares of stock under terms which were not only of no advantage to the corporation and illegal, but also inequitable so far as concerned other stockholders who did not have similar opportunities to take stock. A further vicious element was the breach of trust involved, for the directors each secretly took shares giving in return something which they had had no legal right to take as trustees for the other stockholders. For all of these reasons they cannot retain the fruits of their illegal acts.

The decisions of the courts of this State are not inconsistent with this conclusion. In *John W. Cooney Co. v. Arlington Hotel Co.,* 11 *Del. Ch.* 286, and on appeal 11 *Del. Ch.* 430 (*101 Atl.* 879, and 106 *Atl.* 39), the issue of bonus stock was declared void, but the holders thereof were held liable up to the par value thereof for the benefit of creditors, and in the case of *Scully v. Automobile Finance Co.,* on a demurrer to the bill, 11 *Del. Ch.* 355, 101 *Atl.* 908, and later on the final hearing, *ante p.* 174, 109 *Atl.* 49, an assessment made by a solvent, active corporation upon holders of bonus stock was upheld. Here in this present case, where all of the directors of the company, who were also its officers, issued stock to themselves for their individual notes, the issue is declared to have been a violation of the Constitution, and as these notes were not used by the company and the company received no money from the makers thereof, they will be required to make reparation to the corporation, which is simply protecting legitimate stockholders from those who seek to profit by their own illegal acts.

Therefore, both because the directors had no right to take promissory notes for shares of stock of the company, and because they committed a breach of trust in taking for the corporation their own notes for shares issued to themselves, the transaction

will be avoided, and they will be required to make reparation therefor.

The stockholders have not acquiesced in or ratified any of the acts complained of, and have not been guilty of laches in seeking relief. The only circumstances urged to show knowledge by stockholders of the transactions complained of was that the books containing minutes of directors' meetings and the accounts of the corporation were present at meetings of the stockholders, and the fact of the appointment by the stockholders of auditors. There was no testimony that audits were made. The presence of the books at the meetings did not justify any inference as to knowledge by stockholders of their contents, and hence no implication of ratification can be justly asserted here. Stockholders have a right to expect the officers of the corporation to be faithful to their trust, and a stockholder is not chargeable with knowledge merely because he might have ascertained facts by an examination of corporate books. One cannot ratify that which he does not know. The burden is on him who relies on a ratification to show that it was made with a full knowledge of all material facts. Stockholders are not presumed to know facts appearing in the records and books of the corporation. Means of knowledge is not knowledge in such case. As was said in *Camden, etc., Co. v. Lewis*, 101 *Me.* 78, 102, 63 *Atl.* 523, 533:

"It is not to be expected, and it is not true generally, that the stockholders in meeting assembled, know what is contained in the records of directors' meetings, or in the books of account."

In addition to cases cited by the Court in this case, see 3 *Cook on Corporations*, (7th Ed.) § 731; 10 *Cyc.* 1079; *Elder v. Western Mining Co.*, 237 *Fed.* 966, 150 *C. C. A.* 616; *Whitten v. Dabney*, 171 *Cal.* 621, 154 *Pac.* 312; *Von Arvim v. American Tube Works*, 188 *Mass.* 515, 74 *N. E.* 680. The case of *Blom v. Blom Codfish Co.*, 71 *Wash.* 41, 127 *Pac.* 596, cited on this point by the defendants, does not meet the issue, for there the Court found that entries by a director in books of the company of payments to himself of salary was admissible in evidence to show an implied contract to pay for the services of the director, the accounts being open and accessible to all the other directors and others interested. That is different from charging the stockholders with knowledge

of the contents of books of the corporation, and the case is not *contra* those above cited.

The stockholders, therefore, have lost no right to relief by reason of anything done or omitted by them, or any of them.

In each of the three foregoing branches of the case there was official misconduct and constructive fraud in voting and taking shares of stock and in voting the salaries, and the directors who committed the breaches of trust should receive no advantage by reason thereof, and should account for any moneys so received. Payment of the par value of the stock is not a proper reparation, and would give the directors an advantage which other stockholders who paid to the company for their stock did not have. An unfaithful trustee must at least return what he has received in violation of his trust, and be deprived of any advantage obtained thereby. In this case the unfaithful trustee directors ran no such risks as other stockholders who paid for their shares took, and the directors were playing safe at the expense of the other stockholders. Repayment of all the moneys obtained from the company as dividends, current and in liquidation, on the fifteen shares and the seventy shares received by each of the same six directors will be the proper reparation to be made by them.

Should each of these six directors be required to repay these moneys, or are they to be held liable to account jointly and severally for all that has been received on the total five hundred and ten invalid shares? It is urged that there was joint action, a common purpose and cooperation in taking the shares, so that each trustee is liable for all of the trustees and all for each. As to the fifteen shares this is clearly true, for there was one vote giving shares to each of the directors. There was no official action whereby the notes were taken for the seventy shares, but it is quite obvious that each director knew of the transaction as to these shares, and that there was concert of action and cooperation as to these, as well as to the fifteen shares. The directors should as joint tort feasors each be held liable for the whole injury and injustice done to the company and its other stockholders, and a joint and several liability enforced. The six directors will, therefore, be required to file in the cause an account of what they have received individually as dividends upon the shares so taken by them, and of

all payments made by them on account of the notes given by them for stock, and will be required jointly and severally to pay to the receiver the moneys found to be due from them. William E. Tunnell having received the sum of two thousand dollars voted for services to himself and the other six directors, will be ordered to pay the same to the receiver with interest from the date of its receipt.

4. The disposal of the plant.

The conduct of some of the officers and directors respecting the closing up of the business of the company is challenged in the bill, and a fraudulent purpose and fraudulent methods are charged. A careful and laborious examination and comment of the facts has been necessary. It is charged that though the company had been prosperous and had large assets on hand, officers and directors conspired to close out the business and transfer it to a new company. Some justification of this exists by drawing inferences from established facts. But on the whole the just inferences from established facts do not sustain the charge as to a conspiracy or wrong purpose in disposing of the assets of the company.

It appears that on July 30, 1917, the company had in hand liquid assets of about four hundred thousand dollars, two steamers, "Henlopen" and "James M. Gifford," and the factory. The fishing season had opened with profitable business, and owing to high prices for oil the company in July, 1917, was doing a business as profitable with only two boats as with four, the number formerly owned and operated. Notwithstanding this prosperity and good prospects, the directors at a special meeting held on July 30, 1917, adopted two resolutions. One resolution authorized President Lofland to sell the two steamers for two hundred thousand dollars. The second resolution authorized the president to sell the factory and two steamers for two hundred and twenty-five thousand dollars, and to call a meeting of the stockholders for their approval. No reason for making the sale was assigned in the resolution, and no definite or official declaration of the reasons therefor have ever been made, so far as it appears in the evidence. On August 2 Lofland offered to Robert Penington, one of the defendants, the steamers and factory, and received from

Penington a letter dated August 2 confirming the agreement made between them, the material part of the letter being, as follows:

"In confirmation of our agreement that you will sell to me, or my heirs or assigns, the steamers 'Henlopen' and 'James M. Gifford,' and the complete plant and equipment of the Lewes Fisheries Company, including the unexpired term of your lease for the property upon which your factory is erected, for the sum of $225,000.00, subject to the approval of your stockholders, I hereby hand you my check for $5,000.00, with the understanding that should your stockholders fail to approve of this agreement that the said sum of $5,000.00 is to be returned to me, provided however, that the title of the said steamers 'Henlopen' and 'James M. Gifford,' or either of them, shall be delivered to me, my heirs or assigns, upon the payment of $180,000.00 for both of said steamers, or for the sum of $140,000.00 for the steamer 'Henlopen' and the sum of $40,000.00 for the steamer 'James M. Gifford,' and that said steamers are to be delivered to me free and clear of all liens and incumbrances, said delivery to be made at any time before or after the ratification of the sale of the assets by the stockholders of your company, it being my understanding that the directors of your company have full power to sell the steamers, but that the sale of the plant and the balance of your equipment must be approved by your stockholders."

Lofland, at the request of Penington, went as his agent to New York to make a resale of one or both of the steamers to the firm of James W. Elwell & Company, of New York, Lofland having told Penington during the negotiations that that firm had recently inquired as to a purchase of the steamers. Lofland on August 3 sold to the Elwell firm for one hundred and seventy-five thousand dollars the "Henlopen," and received a check from the purchaser to the order of the Lewes Fisheries Company for seventeen thousand, five hundred dollars, on account of the price. Though really acting as agent for Penington, the negotiations were had as though the steamer was owned by the company. On August 3 Lofland as president of the company executed an agreement of sale of the steamer to the New York purchaser, therein stating that the balance of the price was to be paid to the president of the Lewes Fisheries Company on delivery of the steamer and a copy of the resolution of the directors authorizing the sale. Penington explained in his answer filed in this cause that the check and contract were so drawn because the title to the steamer was in the company "and for no other purpose and with no other design." Lofland in his answer gave as a further reason that the

receipt of the purchase money for the steamer by the company was thereby secured.

A special meeting of the directors was held August 4, all of the directors being present, but no report was made of the sale of the "Henlopen" by Lofland as agent of Penington, and none of the directors, except Lofland, then knew of it. By the minutes this appears:

"Mr. Lofland read letter from Mr. Penington making offer for plant and equipment. Mr. Baylis moved that his offer be accepted with the price of the steamer 'Gifford' increased from 40 to 60,000.$^{00}/_{100}$."

Another motion adopted unanimously was to call a meeting of stockholders for August 10 "for the purpose of confirming sale of plant, steamers and equipment to Robert Penington for two hundred and twenty-five thousand dollars ($225,000.00)."

Notices sent of the stockholders' meeting stated the object to be the "confirming sale of the plant, steamers and equipment of Lewes Fisheries Company in its entirety," referring evidently, according to other statements in the notice, to the steamers "Henlopen" and "James M. Gifford," and the plant and equipment. No mention was made in the notice of the resale of the "Henlopen." Penington in a letter dated August 8 to Lofland stated that he understood that the two steamers had been sold and the price of the "Gifford" raised to sixty thousand dollars, and that the meeting of the stockholders would be held "for the purpose of ratifying the sale of the entire assets."

The minutes of the stockholders' meeting held August 10 stated that the meeting was called to confirm the sale of the whole plant, steamers and factory as an entirety; that the minutes of the special meeting of the directors were read and adopted; and that the two letters from Penington were read and ordered recorded as part of the minutes. Then follows this entry:

"W. H. Bookhammer introduced information that the steamer 'Henlopen' had been sold for the sum of $175,000 to the French government. On strength of this information a number of talks were made.

"After some little discussion, resolution was introduced * * * which read as follows:

"Be it resolved by the stockholders of Lewes Fisheries Company that the fishing boats 'Henlopen' and 'Gifford' and the manufacturing plant of

said company, located near the town of Lewes, together with all machinery and equipment, belonging to and connected with said boats or plant, excepting, however, all manufactured product now in possession of said company or to be manufactured before the date of the consummation of the sale, if these terms be accepted. And all coal now in possession of said company be sold and conveyed to Robert Penington, Esq., for the sum of $225,000.00, and that the proper officers of this company be and are hereby authorized to execute the papers necessary to effect said sale upon the payment of the full purchase price thereof, as above stated."

There were 2,317 votes cast for and 148 against the resolution, so that more than two-thirds of the 2,855 possible votes were cast for the resolution.

With respect to the sale of the property of the company it is claimed by the receiver: (1) That it was accomplished by fraud practiced on the directors and stockholders by Lofland and Penington, and with the assistance of other directors, and a revocation and nullification of the action of the company in disposing of the two steamers and the plant is asked for, and that the property be restored to the receiver of the company. (2) That if valid, the company did not receive from Penington all that it was entitled to have under the resolution adopted by the stockholders These will be considered separately.

The basis of the charge in the bill of fraud in the sale of the property of the company is the duplicity of Lofland in acting as the agent both of the company and of Penington in selling to him property of the company and making the resale for him of a valuable part of it, and the concealment and misrepresentation of facts which the stockholders had a right to know of.

"The agent will not be permitted to serve two masters without the intelligent consent of both." *Mechem on Agency*, § 1189.

Any surreptitious dealings between one principal and the agent of the other principal is a fraud on the other principal, cognizable in this Court. Lord Justice James in *Panama, etc., Co. v. India, etc., Co.*, 10 *L. R. Ch. App. Cas.* 515, 526, after stating the above principle, said:

"That I take to be a clear proposition, and I take, according to my view, to be equally clear that the defrauded principal, if he comes in time, is entitled, at his option, to have the contract rescinded, or, if he elects not to have it rescinded, to have such other adequate relief as the court may think right to give him."

In the case above cited A. company agreed to lay for B. company a cable to be paid for in part by installments payable on certificates given by the engineer named in the contract. This engineer afterwards agreed with A. company to lay the cable for a sum to be paid to him by installments payable by A. company when A. company received the installments from B. company. The agreement between the engineer and A. company was declared to be a fraud which entitled B. company to have the contract rescinded and to receive back the money they had paid under the contract. The Court considered that A. company had placed the engineer in an anomalous and dangerous position in which his interest would necessarily conflict with his duty. When it was there urged that there had been no concealment on the part of A. company, the Court said:

"But on such a subject as this there should not only have been an absence of concealment, but full and complete disclosure and information."

Good faith and loyalty of an agent towards his principal is essential, and he cannot rightly assume a position, or put himself in an attitude inconsistent with his duty to his principal, or antagonistic to his interests. An agent cannot act for parties to a transaction with divergent or conflicting interests. If he does so he is liable to his principal for any loss resulting therefrom. It is the duty of an agent to disclose to his principal knowledge as to the subject matter and it is thus expressed in 1 *Clark & Skyles on Agency*, § 416, and cases there cited:

"The duty of an agent to act in good faith and loyalty towards his principal includes the duty on the part of the agent to communicate to the principal notice of any facts which come to his knowledge in the course of the agency, and which may affect the interests of the principal, in order that the latter may take such steps as may be necessary for the protection of his interests; and for the failure to give such notice the agent will be held responsible in damages to his principal."

If an agent in contracting with a third person on behalf of his principal is guilty of a fraud upon the principal, or breach of trust to which the third party is privy, the contract is voidable at the option of the principal. 1 *Mechem on Agency*, § 1201; *Clark & Skyles on Agency*, § 456, *p.* 1005; *City of Findlay v. Pertz*, 66 *Fed.* 427, 13 *C. C. A.* 559, 29 *L. R. A.* 188.

One who participates with a trustee in a breach of trust may be held liable in a court of equity. If he still holds the trust property or its proceeds, he may be held as constructive trustee thereof; and if he no longer holds the trust property, or its proceeds, he may be held liable in equity to account for any advantage derived. All those interested may come in to share in the amount recovered according to their respective interests. *Eberhardt v. Christiana Window Glass Co.*, 9 *Del. Ch.* 284, 299, 81 *Atl.* 774. In *Attorney General v. Cradock*, 3 *Myl. & C.* 85, a bill was filed for relief of a charitable trust, the breach of trust being that one of the trustees and Cradock, who was not a trustee, diverted part of the trust property by an exchange for property which belonged to them jointly. Lord Chancellor Cottenham described Cradock as one "who has made himself by uniting with the trustee in a breach of trust, part and parcel of the transaction." These principles based on common honesty are well established by decisions, if precedent be required. They are applicable to the relation of the president of a corporation to the corporation, as well as to other officers or directors in transacting the business of the corporation, or dealing with its property or rights.

Assuming, then, that the purpose in selling the entire plant was fair and honest, and the reasons therefor were proper and bona fide, such as the uncertainty of the effect of the war and the like, what wrong advantage was taken by the officers and directors, or any of them, or by Robert Penington? In judging Lofland's conduct his powers must be considered. By the resolution of the directors he was authorized to sell the two steamers for two hundred thousand dollars, and also to sell the steamers and factory for two hundred and twenty-five thousand dollars. Whether these were alternative propositions, or the latter included and acted as a substitute for the former, is immaterial, for Penington did not accept the former and accepted the latter, and made a new offer for the two steamers, viz.: Instead of two hundred thousand dollars fixed by the directors, he offered one hundred and eighty thousand dollars for them. The directors accepted the offer for the whole plant subject to the approval of the stockholders, and this was the one which was carried out later. It is clear, therefore, that when Penington wrote the letter dated August

he had acquired no title to any property of the company, and neither did he until the stockholders had acted. Penington had no right to resell the "Henlopen" prior to the meeting of the stockholders, for until then there was only an unaccepted offer by him for the steamers and plant as an entirety.

Another important incident is, that with this offer pending and unaccepted, Lofland at the request of Penington acted as his agent to resell and resold the "Henlopen" for thirty-five thousand dollars more than Penington had offered for it. This was a breach of trust on the part of Lofland, who tried to serve two masters with conflicting interests, and he could not honestly serve both. If Lofland had communicated to his directors and stockholders the fact of the resale at the large advance, and his connection with the transaction, then they would at least have been put on their guard and would also have had a right to withdraw the offer made to Penington, repudiate Penington's right to resell the "Henlopen," and either adopt or reject for the company the sale of the "Henlopen" which had been made for him, and even hold Penington to his offer for the whole plant including the "Henlopen" for two hundred and twenty-five thousand dollars. But an opposite course was pursued. The resale and Lofland's connection with it was concealed by both Penington and Lofland from both directors and stockholders. Lofland did not report that he had resold for Penington, but in the name of the company, a steamer for thirty-five thousand dollars more than Penington had offered for it; nor that he had received from the purchaser a check for seventeen thousand, five hundred dollars payable to the company; nor that he had executed in the name of the company an agreement to sell the steamer. That check did not appear on the books of the company until August 9, and there was no evidence that its presence there was known until after August 10 by any director or stockholder, and no explanation was made as to how it came to be there.

In ignorance of this conduct of their agent the directors adopted two resolutions, the first to accept the offer of Penington for the two steamers, the price of the "Gifford" being increased from forty thousand dollars to sixty thousand dollars. This was not an acceptance of Penington's offer for the two steamers, for

he had offered only forty thousand dollars for the "Gifford."
Indeed, the purpose of this motion is not clear. The second re-
solution was for a call of a stockholders' meeting to confirm the
sale of the whole plant as an entirety for two hundred and twenty-
five thousand dollars. This nullified the earlier motion respecting
the price of the "Gifford," and the form of the call of the meeting
shows that such was the intention of the directors.

It appeared, then, that as the steamer "Henlopen" was worth
one hundred and seventy-five thousand dollars, and as the "Gif-
ford" was shown to be then worth sixty thousand dollars, the
aggregate price which could then have been obtained for them
was two hundred and thirty-five thousand dollars or ten thousand
dollars more than the price fixed for the steamers and factory.
Lofland as president had no right to make such a bargain for the
person for whom he was secretly acting as agent. Yet Penington
made him his agent, and so made himself part and parcel of the
transactions of his agent, and responsible for his concealments
as well as his affirmations. To be faithful to his company Lofland
was bound to tell of the resale, while to be faithful to Penington
he was bound to conceal the resale, and his relation to it. It is
futile to claim for Penington that he was treating at arm's length
with the Lewes Fisheries Company. The letter of Penington to
Lofland dated August 8 does not throw much light on the subject,
and there is no evidence that it was made known to any one
connected with the company until it was read at the meeting of
the stockholders, and further, it was addressed to Lofland per-
sonally, it does not mention the resale of the "Henlopen". In
it Penington asks Lofland to look after the interests of the writer
in putting through the sale of the whole plant. A stricter re-
sponsibility rests upon the purchaser of the plant in this case than
upon the other defendants, for he was a lawyer. Indeed, the only
doubt that has come on this branch of the case arises from the
confidence of the Court in his integrity. But there is no escape
from the conclusion that he must stand the consequences of
Lofland's concealment of facts which should have been disclosed.

It is important to ascertain what knowledge of the resale of
the 'Henlopen" the stockholders had at the meeting on August
10. Lofland concealed entirely the resale of the "Henlopen" and

his connection with it, and it was not known by any other director or stockholder of the company until after the stockholders' meeting. To the several inquiries made at and just before the meeting as to the resale Lofland gave evasive and misleading answers when he should have told the whole truth as to the resale and his connection with it. The concealment was of itself sufficient to make voidable the action of that meeting, for there was a breach of trust, and by making Lofland his agent Penington made himself part and parcel of the legal fraud. But if the stockholders at the meeting and before voting knew the real situation as to the disposition of the property of the company, then the consequences would be different.

What took place at the meeting? The minutes show that it was called to confirm the sale of the whole plant. The minutes of the special meeting of the directors were read and adopted. Penington's two letters of August 2 and 8 were read and recorded as part of the minutes. Then came the entry that W H. Bookhammer had introduced information that the steamer "Henlopen" had been sold for one hundred and seventy-five thousand dollars to the French government. After some little discussion the re-resolution (prepared during the meeting by Frank M. Jones, Esq., a lawyer of Georgetown, acting under a proxy for a stockholder) was offered, voted on and adopted by more than two-thirds in the outstanding capital stock.

Was the entry in the minutes that Bookhammer had given the above information a correct statement of what took place? There is a diversity of testimony on this. Bookhammer says that he spoke of the matter only as a rumor of a sale to the French government for one hundred and seventy-five thousand dollars, and on the strength of the rumor urged the stockholders not to vote to confirm the sale, though later he voted in favor of the resolution, not only his own but other shares of stock for which he held proxies. This is probably a true version of what he said, for just prior to the meeting he with Thompson and Baylis had asked Lofland about the sale and received an evasive answer. This is corroborated by Thompson and also by Frank M. Jones, who was all the time during the meeting in the main room where it was held, and who in particular is clear that the statement of

Bookhammer was of a rumor of a sale and not a statement of a sale. Other witnesses state that it was told at the meeting that the steamer had been in fact sold for one hundred and seventy-five thousand dollars, and that this information was generally had by the stockholders.

What, then, did the stockholders know at the meeting? They knew that the directors valued the two steamers at two hundred thousand dollars; that Penington offered one hundred and forty thousand dollars for the "Henlopen" and forty thousand dollars for the "Gifford"; that Penington was ready to take the steamers and factory for two hundred and twenty-five thousand dollars, the price fixed by the directors subject to the approval of the stock holders. There was an unconfirmed, widely circulated rumor that the "Henlopen" had been sold to the French government for one hundred and seventy-five thousand dollars, and presumably by Penington, who had the option thereon. It might have been argued on behalf of Penington that the stockholders before voting knew that thirty-five thousand dollars could be obtained for the "Henlopen" in excess of the price at which Penington valued it, and by voting to accept the offer for the whole plant, knowing they had a right to vote to reject it and so perhaps make a better bargain for the company, the stockholders were not injured by the breach of trust of their president, and are bound by their acceptance of the offer. But these stockholders, speaking generally, did not know, and the directors other than Lofland, did not then know, because it was concealed from them by the one whose duty it was to inform them, that Lofland in the name of the company, but as agent for Penington, resold the "Henlopen" for thirty-five thousand dollars more than it was valued by both Penington and the directors, and they approved the sale of the property as a whole in ignorance of Lofland's duplicity and breach of trust.

From this one is reluctantly driven to the conclusion that such an advantage was taken of the ignorance of the stockholders of facts above referred to, which were concealed from them by one whose duty it was to inform them of these facts, that they did not then have before them data from which to make an intelligent choice, or protect themselves from the effect of the dulicity of their trusted representative. Furthermore, though it

is not necessary to go to thal length, it is highly probable that a necessary number of votes would not have favored the resolution if a full explanation had been made. Under such conditions it is idle talk to assert that Penington treated at arm's length with the company in purchasing its property.

It is contended by the receiver that in addition to the recovery of the thirty-five thousand dollars, the property of the company bought by Penington, except the steamer "Henlopen," which was sold to a bona fide purchaser without notice of the false dealing of Lofland, should be restored to or for the benefit of the stockholders. This property has been transferred by Penington to the Lewes Oil & Chemical Company, and it was shown to be still the owner of it. It is claimed that the new company was not a bona fide purchaser for value without notice, because it was incorporated and organized by Penington to take over this property; he was an incorporator thereof, the others being his agents; he is its president, Lofland its manager, Lank its treasurer, and these three, together with Joseph and Tunnell, are stockholders, and the five as stockholders control the company. In support of these claims the pertinent cases of *Eberhard, et al., v. Christiana Window Glass Co., et al.,* 9 *Del. Ch.* 284, 81 *Atl.* 774, and *Cumberland, etc., Co. v. Sherman,* 30 *Barb.* (*N. Y.*) 553, are cited. These facts are admitted, and there is no word of explanation or denial by any one on behalf of the Lewes Oil & Chemical Company of any fact to show the ignorance of any one representing it as to the method and manner by which it acquired the property. The absence of any testimony by either Lofland or Penington as witnesses was as suggestive as to this transaction as to the other transaction of Penington with the corporation.

It is a just conclusion that the Lewes Oil & Chemical Company is not entitled to any consideration as an innocent purchaser for value. It would be within the power of the Court to restore in some way to the stockholders of the Lewes Fisheries Company the property obtained from it by these unworthy methods, but at this time it does not appear to be feasible to do so inasmuch as the Lewes Fisheries Company has been dissolved, and there are other difficulties. It is clear that the sale of the plant should not be disturbed, and that a fair and equitable recompense to be made to

the stockholders for the advantage taken of them by Lofland and Penington would be to require Penington to relinquish the fruit of the advantage taken by him and his agent, Lofland, viz.: the sum of thirty-five thousand dollars, the amount which was realized by the resale of the "Henlopen," less any commission paid for the sale of the steamer. Inasmuch also as this advantage was procured through Lofland's duplicity, they should both be required to make the restitution.

Therefore, it is found that by reason of the concealment by Lofland as the agent of Penington from the stockholders of the resale by Lofland as agent of Penington of the steamer "Henlopen," it being a part of the plant of the company which Lofland was authorized to sell as an entirety, subject to the approval of the stockholders, Penington obtained at the stockholder's meeting on August 10, 1917, an unconscionable advantage over the stockholders in the purchase by him of the plant, and that the stockholders are entitled to the advantage which he so obtained, viz.: the sum of twenty-six thousand, two hundred and fifty dollars the amount which he realized by such advantage, viz.: the sum of thirty-five thousand dollars, less a commission of eight thousand seven hundred and fifty dollars paid by him, and that interest be paid on the said sum of twenty-six thousand, two hundred and fifty dollars from the tenth day of August, 1917, the date of the meeting of the stockholders and the day on which Penington took possession of the plant.

Did the Lewes Fisheries Company receive from Robert Penington, the purchaser of the plant, the product of the factory from August 10 to August 22, 1917?

Penington took possession of the plant and steamer "Gifford" on August 10, 1917, and operated the same as his own property, and so continued until September 1, when he sold and transferred it to Lewes Oil & Chemical Company, one of the defendants, and thereafter the plant was operated by it up to the filing of the bill, under the management of Lofland. None of the products of the plant after August 10 were credited or paid to the old company, but were received by Penington to September 1, and thereafter by the new company. There is no dispute as to these facts. The Lewes Fisheries Company received the value of the products on

hand to August 10.   By a bill of sale dated August 10 the "Hen-lopen" was transferred to Elwell & Co., and by a bill of sale dated August 15 the steamer, "James M. Gifford" was transferred to Penington, and also a transfer of the factory dated August 22 and the lease was assigned to him on the same day.   The Lewes Oil & Chemical Company, another of the defendants, was created on August 21, 1917, the incorporators being Robert Penington, subscriber for ninety shares, and two other persons, each of whom subscribed for five shares and acted therein as agents of Robert Penington.   On September 1 the steamer, plant and lease were transferred by Penington to the new company, and Robert Pen-ington is president of the new company, Lofland is vice-president and manager, and Lank is treasurer, and Penington, Lofland and Lank are directors and large stockholders.   Joseph and Tunnell are also stockholders, and these five control the company.

Did the Lewes Fisheries Company receive from Penington all that it was entitled to have under the resolution of the stock-holders?   The only proposition on which the stockholders acted was the offer for the two boats and factory for two hundred and twenty-five thousand dollars, and it was accepted, reserving "all manufactured product now in the possession of said company, or to be manufactured before the date of the consummation of the sale," the conveyance of the property to be made upon payment of the full purchase price.   It is not claimed that the company did not receive the value of the product on hand August 10; but it is charged that the product after August 10 was withheld from it.   By paragraph twenty of the bill it was distinctly charged that two items credited on the books of the company as payments by Penington on account of the purchase price for the property, viz.: five thousand dollars credited on August 20, and fifty-three thou-sand, seven hundred and fifty dollars credited on August 21 had been obtained from sales of products of the factory prior to August 21, and, therefore, under the resolution of the stockholders be-longed to the company and not to Penington, and so could not properly be so applied to his credit.   This direct and explicit allegation was not denied by Penington when he answered this paragraph.

To what date was the company entitled to the products of

the factory? By the resolution, to the date of the consummation of the sale. This could mean nothing else than the date of payment of the whole of the purchase money, for the transfer was not to be made until then. It was not contemplated, therefore, that Penington would be put in possession immediately on August 10, when the company had received only seventeen thousand five hundred dollars and five thousand dollars, an insignificant part (one-tenth) of the purchase price. But Lofland, the president and manager of the company and agent of Penington, and manager for him of the plant after August 10, stood by his new principal as against the Lewes Fisheries Company. Still this unwarranted and untimely turning over of the property to Penington did not deprive the company of its rights to the product manufactured up to the final payment of the sum of two hundred and twenty-five thousand dollars, which was on August 21, the day on which the sale was consummated.

What was the amount of such products from August 10 to August 22? For the receiver it is urged that the amount is fifty-eight thousand, seven hundred and fifty dollars, the aggregate of the two amounts mentioned in paragraph twenty of the bill, as above stated. It is urged that the allegation being of a fact which was peculiarly within the knowledge of Penington, his failure to deny it by his answer was an admission of the truth of the statement, and authorities are cited to support this contention. But it has been decided authoritatively otherwise by the Court of Errors andAppeals in this State in the case of *Cochran v. Evans*, 1 *Harr.* 200, where it was held that if a material fact stated in the bill being neither admitted nor denied in the answer the complainant must prove it at the trial. What is admitted need not be proved, but what is not denied is not, therfore, admitted. There is, however, testimony in the case by the receiver that it was shown by the books of the company that the value of the product manufactuerd at the plant from August 10 to 22, 1917, was approximately thirty-eight thousand dollars, as ascertained from gross sales made. There was no denial or explanation made by Penington, or his agent, Lofland by answer, and neither of them took the stand as witnesses. It is found, therefore, that the Lewes Fisheries Company did not

receive from Penington the products of the factory of the company between the tenth day of August and the day of the consummation of the sale of the factory to him, viz. the twenty-first day of August, 1917, and that the receiver is entitled to have the value of such products. The defendant, Penington, will be required to file in this cause an account in detail of such products.

The costs of the cause will be imposed upon all of the individual defendants.

NOTE. On appeal the decree entered in accordance with the foregoing opinion was affirmed by the Supreme Court. See 118 Atl. 1. The report of the case on appeal will appear in 13 Del. Ch.